IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

DANDY VEAL, LLC
N6667 County Road AB
Luxemburg, Wisconsin, 54217

    Plaintiff,

  v.

PETER LEHMAN, an Illinois citizen,
451 W. Deming Place
Chicago, Illinois, 60614-1718

and PACKERLAND WHEY PRODUCTS,
INC., a Wisconsin corporation,
407 4th Street
Luxemburg, Wisconsin 54217,

    Defendants.

## COMPLAINT

Plaintiff Dandy Veal, LLC, by its attorneys Mark M. Leitner and Jessica L. Farley, of the law firm of Laffey, Leitner & Goode LLC, alleges as follows for its complaint against Defendants Peter Lehman and Packerland Whey Products, Inc.:

### NATURE OF THE SUIT

1. This is an action to hold defendants Peter Lehman and Packerland Whey Products, Inc. d/b/a Fermented Nutrition Corporation ("Packerland") responsible for losses caused by their fraudulent conduct in the marketing and sale of Packerland's animal feed ingredient Lacto-Whey. Lehman is a Chicago-based investor whose private equity fund purchased Packerland in mid-2012. When Packerland began to experience financial troubles some time after the acquisition, Lehman sought to get out from under those difficulties by

defrauding Packerland's customers. For a period of at least 18 to 20 months from late 2013 through early 2015, Packerland sold Lacto-Whey to dozens if not hundreds of dairy farmers – including plaintiff Dandy Veal – in Wisconsin, Iowa, Florida, and other states using false and fraudulent representations about Lacto-Whey's protein and solids/minerals content to induce the sales.

2. Pursuant to its legal duty under Wis. Admin. Code ATCP 42.12, Packerland guaranteed that Lacto-Whey would have not less than 44% crude protein content and not less than 61.5% solids and various minerals. Despite these representations, over the time period relevant to this case Packerland consistently shipped to its customers nationwide, including Dandy Veal, Lacto-Whey that had protein and mineral/solids content significantly below the promised levels. The lack of the promised protein content adversely affected the animals' health and impaired their milk production, and the lack of minerals/solids in the product had adverse effects on various aspects of animal health, both of which directly caused Dandy Veal and other farmers to suffer financial harm.

3. Lacto-Whey is delivered to purchasers as a liquid product in 50,000-lb. capacity tanker trailers. Decreasing the warranted percentage of protein and solids/minerals meant that Packerland was diluting the product by making up the difference in each tanker load with water, and because without laboratory testing it is effectively impossible to tell whether Lacto-Whey has been diluted below the promised levels of protein and solids/minerals content, **Packerland was charging its customers for water when it had promised them Lacto-Whey.**

4. The financial harm suffered by Dandy Veal and other farmers by virtue of Packerland's false representations would be bad enough on its own. The injury is compounded by the fact that Packerland and its principal owner Peter Lehman knew exactly what they were

2

doing when they sold Lacto-Whey through lies. Specifically, at a time when Packerland's financial situation was deteriorating, Lehman directed Packerland to decrease the protein content of Lacto-Whey in order to save money on ingredients, but not to change the representations of the percentage of protein and minerals/solids contained in the written guaranteed analysis, so Packerland's customers would not be told about the decrease in true protein content.

## PARTIES, JURISDICTION AND VENUE

5. Plaintiff Dandy Veal is a Wisconsin limited liability company with its principal place of business at N6667 County Road AB, Luxemburg, Wisconsin.

6. Defendant Peter Lehman is an individual who, upon information and belief, is a citizen of Illinois. Upon information and belief, Lehman is the principal of a private equity firm called Granite Creek, LLC, which directly or indirectly owns and/or controls Packerland.

7. Defendant Packerland Whey Products, Inc. is a Wisconsin corporation with its principal place of business at 407 Fourth Street, Luxemburg, Wisconsin. Packerland now does business under the trade name "Fermented Nutrition Corporation."

8. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 because one of plaintiff's claims arises under a statute of the United States. This court has supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367.

9. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

10. This Court has personal jurisdiction over defendant Lehman pursuant to 18 U.S.C. § 1965(b) and over defendant Packerland because Packerland is a domestic corporation and it is engaged in substantial and not isolated activities in Wisconsin.

## GENERAL ALLEGATIONS

11. Dandy Veal operates a dairy farming operation with approximately 3180 heifers, cows, and steers at the time of the events described in this complaint.

12. Starting in 2003 and continuing through the spring of 2015, Dandy Veal purchased Lacto-Whey from Packerland as an additive for cattle feed. On average, Dandy Veal purchased approximately one 50,000-lb. truck-load of Lacto-Whey from Packerland every week during that time period. Dandy Veal counted on Lacto-Whey to have at least the guaranteed level of crude protein and solids, and fed Lacto-Whey to its animals to improve their general and reproductive health, growth, and milk yields over and above the levels experienced prior to purchasing Lacto-Whey. The represented protein and mineral content of Lacto-Whey were the principal reasons why Dandy Veal bought Lacto-Whey from Packerland.

13. Having accurate information about the protein and mineral content of animal feed is crucially important in the operation of a dairy farm. If a farmer's information about the protein and mineral content is not accurate, the ration fed to the animals will not be properly balanced. In particular, when the ration contains less protein and minerals than the farmer believes are present, the ration imbalance will result in health problems, lower milk production, delayed maturation of animals for breeding and other purposes, and negative effects on reproductive health.

14. During the time that Dandy Veal bought Lacto-Whey from Packerland, Packerland sent invoices for Lacto-Whey to Packerland through the United States mails, and Dandy Veal sent payments for Lacto-Whey to Packerland through the United States mails. Upon information and belief, Packerland also sent invoices for Lacto-Whey to its other customers

through the United States mails, and other customers who purchased Lacto-Whey from Packerland used the United States mails to send payments for Lacto-Whey to Packerland.

15. During the time that Dandy Veal bought Lacto-Whey from Packerland, the product was sold by Packerland with a guaranteed analysis warranting that the crude protein content of Lacto-Whey was not less than 44%, and that the product's solids content was not less than 61.5%.

16. The protein content of Lacto-Whey as represented on the guaranteed analysis was important to Dandy Veal because the total protein content of the feed that Dandy Veal fed to its animals after the addition of Lacto-Whey adversely affected the milk yield, the general and reproductive health, and the growth and maturation of Dandy Veal's animals.

17. Dandy Veal had reviewed the guaranteed analysis for Lacto-Whey at or around the time that Dandy Veal began purchasing Lacto-Whey from Packerland, and during the ensuing years Dandy Veal from time to time consulted the guaranteed analysis to ensure that its animals were continuing to receive the same amount of added nutritional benefits that they had been receiving. Dandy Veal expressly relied upon the representations made by Packerland in the guaranteed analysis as to the true protein content of Lacto-Whey and as to its solids/minerals content in making each and every purchase of Lacto-Whey from Packerland.

18. During the 18 to 20 months prior to March of 2015, Dandy Veal purchased approximately one 50,000-lb. truckload of Lacto-Whey per week from Packerland.

19. During that same time period, Packerland was conducting its own internal tests of Lacto-Whey's protein content. Upon information and belief, all loads of Lacto-Whey tested by Packerland during the 18 to 20 months prior to March 2015 had a true protein content of less than 44% and a solids/minerals content of less than 61.5%.

5

20. It was no surprise to Packerland that its internal tests of Lacto-Whey consistently showed results that were short of the true protein content and solids/minerals represented by Packerland in the guaranteed analysis. Packerland had been adjusting the contents of its formula for Lacto-Whey in order to save money on production costs.

21. Specifically, during 2013 and 2014 Packerland's financial situation deteriorated. In response, Peter Lehman directed Packerland management and employees to change the formula of Lacto-Whey so ingredient costs decreased, without regard to the impact of the change on the representations that Packerland made in the guaranteed analysis. In effect, this meant that the Lacto-Whey sold by Packerland was significantly watered down.

22. Dandy Veal, like most dairy farming operations, from time to time retains the services of animal nutritionists to analyze the feed being given to its animals and provide nutrition profile test results documenting the nutritional content of the feed.

23. During February and March of 2015, Dandy Veal's nutritionists advised Dandy Veal that test results on the Lacto-Whey purchased by Dandy Veal from Packerland and fed to Dandy Veal's animals showed that the Lacto-Whey failed to meet the levels specified in the guaranteed analysis. Specifically, in 20 separate tests of Lacto-Whey purchased by Dandy Veal and other customers from Packerland, each and every test demonstrated that the load of Lacto-Whey tested fell short of the 44% true protein content represented by Packerland in the guaranteed analysis, and many of the tests demonstrated that the load tested did not meet the 61.5% solids/minerals content represented by Packerland in the guaranteed analysis.

24. During the same time period that Packerland had been selling it watered-down Lacto-Whey, Dandy Veal observed that the milk production of its herd had dropped off noticeably. In fact, the decrease in milk production was directly and proximately caused by

6

Packerland's practice of altering the formula for Lacto-Whey by watering it down in order to save money.

25. On or about April 14, 2015, Dandy Veal exercised its right under Wis. Stat. § 402.515 to demand that Packerland preserve all samples of Lacto-Whey in its possession and make those samples available to Dandy Veal for inspection and testing "for the purposes of ascertaining the facts and preserving the evidence." Despite ample advance notice, Packerland unlawfully refused to allow inspection and testing of the samples.

26. On or about April 14, 2015, Dandy Veal notified Packerland of Packerland's breach of contract and breach of warranty.

**FIRST CLAIM FOR RELIEF – VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**

27. Dandy Veal realleges paragraphs 1 through 26 as if set forth in full.

28. Packerland is an enterprise engaged in interstate commerce within the meaning of 18 U.S.C. § 1961(4).

29. Defendant Lehman has violated 18 U.S.C. § 1962(c) because he has conducted or participated, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

30. Defendant Lehman conducted the affairs of Packerland by, among other things, using his position as a principal of Granite Creek, the company that effected the acquisition of Packerland, to direct and control the activities of Packerland's officers and employees as alleged with greater specificity elsewhere in this Complaint.

31. The predicate crime committed by Lehman is mail fraud, as defined by 18 U.S.C. § 1341.

32. In violation of 18 U.S.C. § 1341, Lehman devised and effected a scheme to defraud Dandy Veal and other dairy farmers located in Florida, Iowa, Wisconsin, and other states by knowingly and deliberately directing Packerland to change the formula for Lacto-Whey to make production cheaper in a way such that the level of true protein in Lacto-Whey would be substantially less than as represented on the Lacto-Whey guaranteed analysis, and by knowingly and deliberately directing Packerland employees to alter records of Packerland's internal tests of Lacto-Whey to make it appear as if those tests showed the product to be in compliance with the representations set forth in the guaranteed analysis.

33. The execution of the scheme to defraud Dandy Veal and other dairy farmers involved a voluminous number of individual instances of the use of the United States mails in furtherance of the scheme, which uses of the United States mails were reasonably foreseeable by Lehman and were essential parts of the fraudulent scheme. Specific instances of the uses of the United States mails and in furtherance of the fraudulent scheme include sending invoices for Lacto-Whey to Dandy Veal through the United States mail, and receiving payments for Lacto-Whey from Dandy Veal and from other dairy farmers through the United States mails.

34. During the period of time that the fraudulent scheme was perpetuated, thousands of fraudulent communications were transmitted through the United States mail. It is Lehman, through his relationship to Packerland, not Dandy Veal, who has, or has access to, the records of these thousands of communications that contained fraudulent representations or were essential parts of the scheme to defraud Dandy Veal and other dairy farmers.

35. The predicate acts committed by Defendants constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

8

36. The acts of mail fraud alleged herein are related because they involve repeated instances of the use of the United States mails to defraud Dandy Veal and other dairy farmers through the sale of many thousands of loads of Lacto-Whey that were induced by fraudulent misrepresentations. Additionally, the existence of a pattern of racketeering activity is further established because the victims of Lehman's fraudulent scheme included not only Dandy Veal but dozens of other dairy farmers located across a wide geographic area extending at least to Florida, Iowa, and other farmers in Wisconsin. Further, the repeated acts of mail fraud occurred over a time span in excess of six months, and could have continued for a significantly longer period of time had Dandy Veal and other farmers not discovered the existence of the fraud. The fraudulent scheme was not a "one-shot deal" despite the fact that it has, so far as Dandy Veal knows, been terminated.

37. Dandy Veal and other dairy farmers throughout the United States that purchased Lacto-Whey have been damaged by reason of Lehman's having conducted the affairs of Packerland through the pattern of racketeering alleged herein. In particular there is a direct and proximate chain of causation from the fraudulent invoices sent by Packerland and paid by Dandy Veal to the economic losses suffered by Dandy Veal and other dairy farmers as a consequence of low protein levels of the Lacto-Whey they purchased. The economic losses suffered by Dandy Veal and other dairy farmers are the natural and expected consequence of the fraudulent scheme perpetrated by Lehman. Also, there are no other parties who have more directly suffered the economic losses that have been incurred by Dandy Veal and other dairy farmers victimized by the fraudulent scheme. The damages arising from the mail fraud stem from the misrepresentations directly aimed at Dandy Veal and other dairy farmers.

38. Dandy Veal and other dairy farmers have been damaged by Lehman operating and conducting the affairs of Packerland through a pattern of racketeering, with predicate acts consisting of mail fraud, in an amount to be proven at trial, which shall also be trebled via 18 U.S.C. § 1964(c). Additionally, Dandy Veal is entitled to its attorneys' fees and costs.

### SECOND CLAIM FOR RELIEF – VIOLATION OF THE WISCONSIN ORGANIZED CRIME CONTROL ACT

39. Dandy Veal realleges paragraphs 1 through 38 as if set forth in full.

40. Packerland is an enterprise within the meaning of Wis. Stat. § 946.82(2).

41. Defendant Lehman has violated § 946.83(3) because he has conducted or participated, directly or indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

42. Defendant Lehman conducted the affairs of Packerland by, among other things, using his position as a principal of Granite Creek, the company that effected the acquisition of Packerland, to direct and control the activities of Packerland's officers and employees as alleged with greater specificity elsewhere in this Complaint.

43. The predicate crime committed by Lehman is mail fraud, as defined by 18 U.S.C. § 1341.

44. In violation of 18 U.S.C. § 1341, Lehman devised and effected a scheme to defraud Dandy Veal and other dairy farmers located in Florida, Iowa, Wisconsin, and other states by knowingly and deliberately directing Packerland to change the formula for Lacto-Whey to make production cheaper in a way such that the level of true protein in Lacto-Whey would be substantially less than as represented on the Lacto-Whey guaranteed analysis, and by knowingly and deliberately directing Packerland employees to alter records of Packerland's internal tests of

Lacto-Whey to make it appear as if those tests showed the product to be in compliance with the representations set forth in the guaranteed analysis.

45. The execution of the scheme to defraud Dandy Veal and other dairy farmers involved a voluminous number of individual instances of the use of the United States mails in furtherance of the scheme, which uses of the United States mails were reasonably foreseeable by Lehman and were essential parts of the fraudulent scheme. Specific instances of the uses of the United States mails and in furtherance of the fraudulent scheme include sending invoices for Lacto-Whey to Dandy Veal through the United States mail, and receiving payments for Lacto-Whey from Dandy Veal and from other dairy farmers through the United States mails.

46. During the period of time that the fraudulent scheme was perpetuated, thousands of fraudulent communications were transmitted through the United States mail. It is Lehman, not Dandy Veal, who has, or has access to, the records of these thousands of communications that contained fraudulent representations or were essential parts of the scheme to defraud Dandy Veal and other dairy farmers.

47. The predicate acts committed by Defendants constitute a "pattern of racketeering activity" within the meaning of § 946.82(4).

48. The acts of mail fraud alleged herein are related because they involve repeated instances of the use of the United States mails to defraud Dandy Veal and other dairy farmers through the sale of many thousands of loads of Lacto-Whey that were induced by fraudulent misrepresentations. Additionally, the existence of a pattern of racketeering activity is further established because the victims of Lehman's fraudulent scheme included not only Dandy Veal but dozens of other dairy farmers located across a wide geographic area extending at least to Florida, Iowa, and other farmers in Wisconsin. Further, the repeated acts of mail fraud occurred

over a time span in excess of six months, and could have continued for a significantly longer period of time had Dandy Veal and other farmers not discovered the existence of the fraud. The fraudulent scheme was not a "one-shot deal" despite the fact that it has been terminated.

49. Dandy Veal and other dairy farmers throughout the United States that purchased Lacto-Whey have been damaged by reason of Lehman's having conducted the affairs of Packerland through the pattern of racketeering alleged herein. In particular there is a direct and proximate chain of causation from the fraudulent invoices sent by Packerland and paid by Dandy Veal to the economic losses suffered by Dandy Veal and other dairy farmers as a consequence of low protein levels of the Lacto-Whey they purchased. The economic losses suffered by Dandy Veal and other dairy farmers are the natural and expected consequence of the fraudulent scheme perpetrated by Lehman. Also, there are no other parties who have more directly suffered the economic losses that have been incurred by Dandy Veal and other dairy farmers victimized by the fraudulent scheme. The damages arising from the mail fraud stem from the misrepresentations directly aimed at Dandy Veal and other dairy farmers.

50. Dandy Veal and other dairy farmers have been damaged by Lehman operating and conducting the affairs of Packerland through a pattern of racketeering, with predicate acts consisting of mail fraud, in an amount to be proven at trial, which shall also be doubled via Wis. Stat. § 946.87(4). Additionally, Dandy Veal is entitled to its attorneys' fees and costs, and to punitive damages.

**THIRD CLAIM FOR RELIEF – WISCONSIN FALSE ADVERTISING LAW**

51. Dandy Veal realleges paragraphs 1 through 50 as if set forth in full.

52. Dandy Veal and other dairy farmers within Wisconsin that purchased Lacto-Whey from Packerland during the time period alleged in this Complaint are members of "the public" within the meaning of Wis. Stat. § 100.18(1).

53. Through its published guaranteed analysis for Lacto-Whey stating that the true protein content of Lacto-Whey was not less than 44%, Packerland intended to sell or distribute Lacto-Whey to the public, including Dandy Veal and other dairy farmers in Wisconsin.

54. Packerland attempted to and did sell or distribute Lacto-Whey to the public, including but not limited to Dandy Veal and other dairy farmers in Wisconsin, by placing before the public statements about Lacto-Whey that were untrue, deceptive or misleading.

55. Packerland's statements in the guaranteed analysis about Lacto-Whey were untrue, deceptive, or misleading because Packerland knew at all times that the true protein content of Lacto-Whey was not in fact not less than 44%, as represented in the guaranteed analysis, and that the minerals/solids content of Lacto-Whey was not in fact not less than 61.5%, as represented in the guaranteed analysis.

56. Dandy Veal received the guaranteed analysis from Packerland containing the untrue, deceptive, and misleading representations about Lacto-Whey, believed those representations, and relied upon them to its detriment by purchasing Lacto-Whey from Packerland and using it as a feed additive to feed Dandy Veal's animals.

57. As a direct and proximate result of its reliance on the untrue, deceptive, or misleading statements by Packerland about Lacto-Whey as alleged in this Complaint, Dandy Veal has suffered pecuniary loss.

58. Under Wis. Stat. § 100.18(11)(b)2, Dandy Veal is entitled to recover from Packerland in this action the amount of its pecuniary loss, plus its attorney fees and costs of bringing this action.

## FOURTH CLAIM FOR RELIEF – INTENTIONAL FRAUD

59. Dandy Veal realleges paragraphs 1 through 58 as if set forth in full.

60. Packerland's representations regarding the protein and solids/minerals content of Lacto-Whey were representations of fact.

61. Packerland's representations of fact regarding the protein and solids/minerals content of Lacto-Whey were untrue.

62. Packerland knew its representations of fact regarding the protein and solids/minerals content of Lacto-Whey were untrue when it made them, or alternatively Packerland made those representations acting recklessly without caring whether they were true or false.

63. Packerland made its false representations of fact regarding the protein and solids/minerals content of Lacto-Whey with the intent to deceive Dandy Veal and induce Dandy Veal to act in reliance on those representations.

64. Dandy Veal believed the untrue representations of fact made by Packerland and relied upon those representations to its detriment by, among other things, continuing to purchase Lacto-Whey from Packerland and feed the product to its animals.

65. The use of Lacto-Whey by Dandy Veal caused physical harm to the animals to which Lacto-Whey was fed, including but not limited to causing adverse effects on general animal health, reproductive health and capacity, and maturity, growth and development.

66. As a proximate result of its reliance on Packerland's intentional misrepresentations of fact, Dandy Veal has been damaged and will continue to be damaged in the future.

**FIFTH CLAIM FOR RELIEF – STRICT RESPONSIBILITY MISREPRESENTATION**

67. Dandy Veal realleges paragraphs 1 through 66 as if set forth in full.

68. Packerland's representations regarding the protein and solids/minerals content of Lacto-Whey were representations of fact.

69. Packerland's representations of fact regarding the protein and solids/minerals content of Lacto-Whey were untrue.

70. Packerland made its representations of fact regarding the protein and solids/minerals content of Lacto-Whey on personal knowledge or, alternatively, under circumstances in which Packerland necessarily ought to have known the truth or falsity of those representations.

71. Packerland had an economic interest in the transactions in which it sold Lacto-Whey to Dandy Veal.

72. Dandy Veal believed the untrue representations of fact made by Packerland and relied upon those representations to its detriment by, among other things, continuing to purchase Lacto-Whey from Packerland and feed the product to its animals.

73. The use of Lacto-Whey by Dandy Veal caused physical harm to the animals to which Lacto-Whey was fed, including but not limited to causing adverse effects on general animal health, reproductive health and capacity, and maturity, growth and development.

74. As a proximate result of its reliance on Packerland's misrepresentations of fact, Dandy Veal has been damaged and will continue to be damaged in the future.

## SIXTH CLAIM FOR RELIEF – BREACH OF CONTRACT

75. Dandy Veal realleges paragraphs 1 through 74 as if set forth in full.

76. The product specifications on Packerland's guaranteed analysis for Lacto-Whey were relied upon by Dandy Veal in purchasing Lacto-Whey, and therefore those product specifications became part of the basis of the bargain for all purchases of Lacto-Whey by Dandy Veal from Packerland.

77. For a time period to be proven at trial, numerous loads of Lacto-Whey sold by Packerland to Dandy Veal did not conform to the specifications set forth in the guaranteed analysis for Lacto-Whey.

78. Each failure of a load of Lacto-Whey sold by Packerland to Dandy Veal to conform to the specifications set forth in the guaranteed analysis constitutes a breach of contract by Packerland.

79. Dandy Veal has been proximately damaged by Packerland's breaches of contract in amounts to be proven at trial.

80. Dandy Veal has performed all conditions precedent to the bringing of this action.

WHEREFORE, plaintiff Dandy Veal demands judgment against defendants Peter Lehman and Packerland Whey Products, Inc. as follows:

A. On its First Claim, judgment in its favor and against defendant Lehman for threefold the damages suffered by it by reason of Lehman's violation of 18 U.S.C. § 1962(c), plus the costs of suit including a reasonable attorney's fee;

B. On its Second Claim, judgment in its favor and against defendant Lehman for double the damages suffered by it by reason of Lehman's violation of Wis. Stat. § 946.83(3), plus the costs of suit including a reasonable attorney's fee, and punitive damages;

C. On its Third Claim, a judgment in its favor and against defendant Packerland for its pecuniary loss suffered by reason of Packerland's untrue, deceptive and misleading statemnets and representations concerning Lacto-Whey, together with its attorney fees and costs of litigation;

D. On its Fourth Claim, judgment in its favor and against Packerland for the damages proximately caused by Packerland's fraudulent conduct, including an award of punitive damages;

E. On its Fifth Claim, judgment in its favor and against Packerland for the damages proximately caused by Packerland's misrepresentations of fact;

F. On its Sixth Claim, judgment in its favor and against Packerland for the damages proximately caused by Packerland's breaches of contract; and

G. Such other and further relief as this Court may deem proper.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated this 22nd day of November, 2016.

/s/ Mark M. Leitner
Mark M. Leitner, Esq.
State Bar No. 1009459
Jessica L. Farley, Esq.
State Bar No. 1065839
LAFFEY, LEITNER & GOODE LLC
325 E. Chicago Street, Suite 200
Milwaukee, WI 53202
(414) 312-7003
(414) 755-7089 (facsimile)
mleitner@llgmke.com
jfarley@llgmke.com
*Attorneys for Plaintiff*