UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DANDY VEAL LLC,

    Plaintiff,

v.                              Case No. 16-C-1565

PETER LEHMAN and
PACKERLAND WHEY PRODUCTS INC,

    Defendants.

---

## DECISION AND ORDER GRANTING MOTION TO DISMISS
## AND DENYING MOTIONS TO INTERVENE AS MOOT

---

      Plaintiff Dandy Veal, LLC, filed this action alleging claims under the Racketeering Influenced and Corrupt Organizations Act ("RICO") and Wisconsin Organized Crime Control Act ("WOCCA") against Defendant Peter Lehman, and claims of false advertising under Wis. Stat. § 100.18, intentional fraud, strict responsibility misrepresentation, and breach of contract against Defendant Packerland Whey Products, Inc., ("Packerland"). Federal jurisdiction over Plaintiff's RICO claim exists under 28 U.S.C. § 1331. The court has supplemental jurisdiction over the remaining claims. 28 U.S.C. § 1367.

      Currently before the court is the Defendants' motion to dismiss all but Plaintiff's breach of contract claim with prejudice for failure to state a claim on which relief can be granted. Defendants then urge dismissal of Plaintiff's breach of contract claim without prejudice for lack of federal jurisdiction. (ECF No. 16.) Also before the court are the motions of Packerland's insurers, Maxum Casualty Insurance Company ("Maxum") and Farmland Mutual Insurance Company ("Farmland"),

to intervene, bifurcate, and stay. (ECF Nos. 10, 24, 26.) For the reasons below, Plaintiff's RICO and WOCCA claims against Lehman will be dismissed for failing to state a claim. With the sole federal claim gone, Plaintiff's remaining claims will be dismissed for lack of federal jurisdiction and the insurers' motions to intervene will be denied as moot.

## RICO ALLEGATIONS OF THE COMPLAINT

Plaintiff Dandy Veal, LLC, operates a farm in Luxemburg, Wisconsin with approximately 3,180 heifers, cows, and steers. Compl. (ECF No. 1), ¶¶ 5, 11. Packerland Whey Products, Inc., also located in Luxemburg, Wisconsin, produces, markets, and sells an animal feed ingredient called Lacto-Whey. *Id.* at ¶¶ 1, 7. Peter Lehman is a Chicago-based investor whose private equity fund, Granite Creek, purchased Packerland in mid-2012. *Id.* at ¶ 6. Dandy Veal claims that Packerland began to experience financial troubles some time after the acquisition and that Lehman, in an attempt to get out from under those difficulties, directed Packerland to decrease the protein content of its Lacto-Whey product without disclosing this fact to its customers. *Id.* at ¶ 21.

According to the allegations of the complaint, from 2003 through the spring of 2015, Dandy Veal purchased the animal feed ingredient Lacto-Whey from Packerland as an additive for its cattle feed. *Id.* at ¶ 12. Packerland guaranteed to its customers that Lacto-Whey would have no less than 44% crude protein content and no less than 61.5% solids and various minerals. *Id.* at ¶ 15. Dandy Veal asserts these guarantees were the principal reasons why it bought Lacto-Whey from Packerland because it allowed Dandy Veal to properly prepare its cattle feed rations. *Id.* at ¶ 12. If the ration fed to a farm animal is imbalanced, it may result in health problems, lower milk production, delayed maturation for breeding purposes, and other negative effects. *Id.* at ¶ 13. During the relevant time

2

period, Dandy Veal purchased approximately one 50,000 pound truck-load of Lacto-Whey every week. *Id.* at ¶ 12.

Dandy Veal claims that for at least 18 to 20 months from late 2013 through early 2015, Packerland, at Lehman's direction, defrauded Dandy Veal, as well as "dozens if not hundreds of dairy farmers" in Wisconsin, Iowa, Florida, and other states by intentionally misrepresenting the protein and solids/minerals content of the Lacto-Whey product it sold them. *Id.* Dandy Veal claims that the low protein content adversely affected its animals' health and impaired its cows' milk production, and that the low minerals/solids content caused other adverse health consequences to its cattle, resulting in financial harm to Dandy Veal and the other farmers who purchased and used it. *Id.* at ¶ 2. Packerland's invoices and Dandy Veal's payments for the Lacto-Whey were sent through the United States mails. *Id.* at ¶ 14. Dandy Veal alleges that Packerland sent invoices and received payments from other customers using the same system. *Id.*

Based on these allegations, Dandy Veal alleges that Lehman conducted Packerland's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Dandy Veal alleges that Packerland is an enterprise engaged in interstate commerce; that Lehman conducted the affairs of Packerland by, among other things, using his position as a principal of Granite Creek to direct and control the activities of Packerland's officers and employees; and that Packerland's use of the mails in connection with its fraudulent scheme constitutes a pattern of racketeering within the meaning of 18 U.S.C. § 1961(5). *Id.* at ¶¶ 28–35.

In support of their motion to dismiss, Defendants contend that Plaintiff's RICO claim is nothing more than a garden-variety commercial fraud claim and fails for several reasons. First, Defendants argue that Dandy Veal lacks standing under RICO because it has failed to allege a causal

3

connection between the harm it purportedly suffered and the predicate acts alleged. Defendants also argue that the complaint fails to allege a pattern of racketeering activity and that Lehman directed or controlled Packerland as a criminal enterprise. Finally, Defendants contend that Dandy Veal has failed to allege fraud with the particularity required under Rule 9(b) of the Federal Rules of Civil Procedure.

## MOTION TO DISMISS

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). In order to survive a motion to dismiss, a plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And while the court must accept all factual allegations as true and draw all reasonable inferences in favor of the non-movant, it need not accept as true any legal assertions or a recital of the elements of a cause of action that are "supported by mere conclusory statements." *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir.2013). "[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

In addition, allegations of fraud are subject to the heightened pleading standard of Rule 9(b), which requires a plaintiff to plead "all averments of fraud . . . with particularity." Fed. R. Civ. P. 9(b). "This heightened pleading requirement is a response to the great harm to the reputation of a business firm or other enterprise a fraud claim can do." *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (internal quotation marks omitted). The purpose of the

4

heightened pleading standard is "to force the plaintiff to do more than the usual investigation before filing his complaint" in order to minimize the damage to reputation a baseless claim of fraud can have on a party. *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). To state the circumstances with the requisite particularity, the plaintiff must allege "the who, what, when, where, and how" of the alleged fraud. *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008). Dandy Veal has alleged that Defendants violated RICO, specifically Section 1962(c). RICO provides for private civil enforcement: "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ." 18 U.S.C. § 1964(c). RICO makes it unlawful for "any person employed by or associated with [an interstate] enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The elements, therefore, are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *United States v. Cummings*, 395 F.3d 392, 397 (7th Cir. 2005).

The complaint claims that the racketeering activity here was mail fraud under 18 U.S.C. § 1341. "Mail fraud, in turn, occurs whenever a person, 'having devised or intending to devise any scheme or artifice to defraud,' uses the mail 'for the purpose of executing such scheme or artifice or attempting so to do.'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (citing 18 U.S.C. § 1341). Dandy Veal alleges Defendants committed mail fraud when they used the United States mails to send invoices and receive payments for the sales of Lacto-Whey induced by fraudulent misrepresentations. Compl. ¶ 36.

Defendants move to dismiss Dandy Veal's RICO claim for the failure to state a claim. They assert that Dandy Veal lacks standing to sue under RICO because it fails to establish a factual and proximate cause between the alleged predicate act and the harm it suffered. Defendants also argue that the complaint fails to allege that Lehman directed/controlled Packerland as a criminal enterprise, that the complaint fails to allege a pattern of racketeering activity, and that Dandy Veal fails to plead mail fraud with particularity. For the following reasons, I conclude that Dandy Veal fails to allege the enterprise, pattern of racketeering activity, and particularity requirements of a RICO claim and the RICO and WOCCA claims will be dismissed.

**A. Standing and Proximate Causation**

"When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led *directly* to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (emphasis added). Defendants argue that Dandy Veal's alleged predicate act in this case—mail fraud—did not directly lead to its injuries. They suggest that to the extent Dandy Veal alleges it was injured, it was because Dandy Veal relied on the protein and mineral content guarantees of Lacto-Whey and not because it received invoices and sent payments through the mail. Defendants thus claim that Dandy Veal lacks standing under RICO because there is no proximate cause between Packerland's use of the mail and the harm alleged.

Defendants' argument assumes that in order to state a RICO claim predicated on mail fraud, a plaintiff must allege that the mailing caused the harm alleged. The assumption is wrong. Mail fraud is a species of fraud. It is fraud in which the United States mails are used to carry out the crime; the mailing is in furtherance of the crime. 18 U.S.C. § 1341; *United States v. McClellan*, 868 F.2d 210, 216 (7th Cir. 1989) (holding that mailing invoices in furtherance of fraud sufficient for mail

6

fraud conviction); *see also Schmuck v. United States*, 489 U.S. 705, 710–11 (1989) ("To be part of the execution of the fraud, however, the use of the mails need not be an essential element of the scheme. . . . It is sufficient for the mailing to be incident to an essential part of the scheme . . . or a step in the plot.") (internal quotations and brackets omitted). Thus, the question is not whether the mailings caused the harm but whether the allegedly fraudulent scheme of which the mailing was in furtherance caused the harm.

Drawing all reasonable inferences in favor of the plaintiff, I conclude that Dandy Veal sufficiently alleges that the mail fraud led directly to its injuries. Dandy Veal alleges that Defendants sent its invoices and received payments through the use of the United States mails in the furtherance of its scheme to defraud its customers by selling diluted Lacto-Whey. The complaint alleges that Dandy Veal was a victim of that fraud and suffered economic losses as a consequence of the low protein levels of the Lacto-Whey it purchased in the form of decreased milk production, as well as impairment of the general and reproductive health of its herd. Compl. ¶¶ 16, 24. Dandy Veal also alleges that it paid the invoices Packerland mailed to it for the defective food additive it received. Thus, Dandy Veal's alleged injuries in this case would not only be the economic losses that resulted from its cattle's decreased milk production and diminished health, but also the losses it suffered by paying for a defective product. Furthermore, there are no allegations that any party was more directly injured than those who bought Lacto-Whey from Packerland. Dandy Veal purchased allegedly defective Lacto-Whey directly from Packerland, which then allegedly resulted in decreased milk production in Dandy Veal's cattle. The purchase of the defective product occurred through the use of the United States mails. Thus, the alleged harm resulted directly from the alleged mail fraud and Dandy Veal has RICO standing.

**B. Conduct Element**

As noted above, in order to state a claim under 18 U.S.C. § 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cummings*, 395 F.3d at 397. Liability under § 1962(c) requires that the defendant "conducted or participated in the conduct of the 'enterprise's affairs,' not just [his] own affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). "[I]t is clear that Congress did not intend to extend RICO liability under § 1962(c) beyond those who participate in the operation or management of an enterprise through a pattern of racketeering activity." *Id.* at 184. Thus, "'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself." *Id.* at 185. Dandy Veal's complaint fails to plausibly allege this element.

Dandy Veal alleges in its complaint that "Lehman conducted the affairs of Packerland by, among other things, using his position as a principal of Granite Creek, the company that effected the acquisition of Packerland, to direct and control the activities of Packerland's officers and employees as alleged with greater specificity elsewhere in this Complaint." Compl. ¶ 30. The problem is there is no greater specificity to be found in the complaint. Other than the conclusory allegation that "Lehman directed Packerland to decrease the protein content of Lacto-Whey in order to save money on ingredients, but not to change the representations of the percentage of protein and minerals/solids contained in the written guaranteed analysis," *id.* at ¶¶ 4, 21, there are no allegations that would lead one to conclude that Lehman was involved in directing the affairs of Packerland. *See Goren v. New Vision Intern., Inc.*, 156 F.3d 721, 727 (7th Cir. 1998) ("Indeed, as the district court noted, the amended complaint does not contain any factual allegations that would lead to the conclusion that

any of these defendants were involved in directing the affairs of New Vision, the alleged enterprise.").

Lehman is identified in the complaint as an Illinois resident who is also, upon information and belief "the principal of a private equity firm called Granite Creek, LLC, which directly or indirectly owns and/or controls Packerland." Compl. ¶ 6. The fact that a person is a principal in a private equity firm that owns or controls a company in another state, however, is hardly enough to support the inference that such person participates in the operation or management of that company. It is by no means clear what if any involvement a principal in a private equity firm would have in the operation or management of a company his firm acquires. Importantly, there are no specific factual allegations as to what Lehman did or said that would support the conclusion that directed or controlled the activities of Packerland officers or employees. This is not enough to state a plausible RICO claim. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Accordingly, the complaint fails to allege this essential element.

**C. Pattern of Racketeering Activity**

The complaint also fails to sufficiently allege a pattern of racketeering activity. A "pattern of racketeering," in the words of the statute, consists of at least two acts of racketeering activity occurring within ten years of each other. § 1961(5). Mail fraud, in violation of 18 U.S.C. § 1341, is one of many federal crimes that are expressly listed in the statute under the definition of racketeering activity. 18 U.S.C. § 1961(1). Thus, it would seem that an allegation of two counts of mail fraud within ten years of each other would be sufficient to plead a pattern of racketeering

activity. Given the potential breadth of the statute, however, "the Supreme Court has attempted to give definition to the pattern requirement to forestall RICO's use against isolated or sporadic criminal activity, and to prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992) (citing *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240–41 (1989)). To that end, the Court has made clear that it is not enough for a RICO plaintiff to merely allege two predicate acts in order to state a claim under RICO. To state a RICO claim, a plaintiff must also satisfy "the so-called continuity plus relationship test: the predicate acts must be related to one another (the relationship prong) *and* pose a threat of continued criminal activity (the continuity prong)." *Midwest Grinding*, 976 F.2d at 1022 (emphasis in original). It is on the continuity prong of the test that Dandy Veal's RICO claim against Lehman falters.

"The continuity requirement exists to give effect to Congress's clear intention that RICO target long-term criminal behavior, . . . as opposed to more discrete acts of fraud." *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 473 (7th Cir. 2007) (internal citations omitted). Continuity can either be closed-ended or open-ended. *H.J., Inc.*, 492 U.S. at 241. Close-ended continuity "refers to criminal behavior that has come to a close but endured for such a substantial period of time 'that the duration of the criminal activity carries with it an implicit threat of continued criminal activity in the future.'" *Jennings*, 495 F.3d at 473 (quoting *Midwest Grinding*, 976 F.2d at 1022–23). In contrast, open-ended continuity is "a course of criminal activity which lacks the duration and repetition to establish continuity . . . [but] 'by its nature projects into the future with a threat of repetition.'" *Midwest Grinding*, 976 F.2d at 1023 (quoting *H.J., Inc.*, 492 U.S. at 242). Here, the

parties agree Dandy Veal's alleged pattern of racketeering is closed-ended. The fraudulent scheme, assuming it ever existed, has come to an end.

To determine whether there is closed-ended continuity, "[r]elevant factors include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986). "[D]uration is perhaps the closest thing we have to a bright-line continuity test: the 'predicate acts' must 'extend over a substantial period of time,'; 'a few weeks or months' is considered insubstantial." *Midwest Grinding*, 976 F.2d at 1024 (quoting *H.J., Inc.*, 492 U.S. at 242). In the Seventh Circuit, the predicate acts must generally occur for more than a year to form a pattern of racketeering activity. *See id.* (citing Seventh Circuit cases where "several months" to an "eighteen-month period" to "several years" were deemed insufficient); *Jennings*, 495 F.3d at 474–75 (ten months of the predicate activity was insufficient); *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 782 (7th Cir. 1994) (nine months was insufficient). Significantly, "[t]he Seventh Circuit . . . does not look favorably on relying on many instances of mail and wire fraud to form a pattern." *Hartz v. Friedman*, 919 F.2d 469, 473 (7th Cir. 1990).

Here, although Dandy Veal contends the predicate acts of mail fraud lasted 18 to 20 months, beginning between approximately July and September 2013 and lasting until March 2015, the complaint only plausibly alleges that the scheme to sell defective Lacto-Whey occurred during February and March 2015—the months in which Dandy Veal test results showed that the Lacto-Whey failed to meet the specified content levels. It alleges that Lehman directed Packerland employees to change the Lacto-Whey formula in 2013 and 2014 to save costs, but offers nothing

11

more in support other than its conclusory statements. Dandy Veal also alleges that its herd's milk production noticeably decreased during "the same time period that Packerland had been selling it watered-down Lacto-Whey", Compl. ¶ 24, but does not state with particularity when the decrease occurred or other relevant information. Furthermore as it relates to the alleged victims, Dandy Veal alleges farmers in Iowa, Wisconsin, and Florida also received defective Lacto-Whey but fails to identify who these alleged victims are or in what manner they were harmed.

It is also noteworthy that the only predicate acts Packerland is alleged to have engaged in are mailing of invoices to its customers. The Seventh Circuit has "repeatedly rejected RICO claims that rely so heavily on mail and wire fraud allegations to establish a pattern." *Jennings*, 495 F.3d at 475; *see also Midwest Grinding*, 976 F.2d at 1024–25 ("[M]ail and wire fraud allegations are unique among predicate acts because the multiplicity of such acts may be no indication of the requisite continuity of the underlying fraudulent activity. Consequently, we do not look favorably on many instances of mail and wire fraud to form a pattern." (internal quotations omitted)). As Judge Cudahy explained in *Lipin Enterprises, Inc. v. Lee*,

> Mail fraud and wire fraud are perhaps unique among the various sorts of 'racketeering activity' possible under RICO in that the existence of a multiplicity of predicate acts . . . may be no indication of the requisite continuity of the underlying fraudulent activity. Thus, a multiplicity of mailings does not necessarily translate directly into a 'pattern' of racketeering activity.

803 F.2d 322, 325 (7th Cir.1986) (Cudahy, J., concurring). Indeed, if sending out invoices for a product that allegedly fails to meet specifications is enough to establish a pattern of racketeering activity, it would seem that almost any garden variety fraud, or even breach of contract, claim would qualify.

In short, the allegations of the complaint only allege facts that show Packerland's Lacto-Whey was defective for a period of two months. Even accepting as true that the defendants knew the product was watered down and sent out the invoices and received payments anyway, the short two month period makes this the type of case better categorized as a garden variety fraud case rather than an ongoing pattern of racketeering. Accordingly, the complaint fails to allege the pattern of racketeering activity needed to support a RICO claim.

**D. Particularity Requirement**

Dandy Veal's RICO claim also fails because it does not plead fraud with the particularity required by Rule 9(b). Fed. R. Civ. P. 9(b). "Rule 9(b) is of course applicable to allegations of fraud in a civil RICO complaint." *Goren*, 156 F.3d at 726. Other than the conclusory allegation that "Lehman directed Packerland management and employees to change the formula of Lacto-Whey so ingredient costs decreased, without regard to the impact of the change on the representations that Packerland made in the guaranteed analysis" in paragraph 21 of the complaint and a similar allegation in paragraph 4, there is no allegation as to specifically what Lehman said, when, where, and to whom. Rule 9(b) requires more.

The purpose of the heightened plea requirement in fraud cases is "to force the plaintiff to do more then the usual investigation before filing his complaint." *Ackerman*, 172 F.3d at 469.

> Greater precomplaint investigation is warranted in fraud cases because public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual) . . . ; because fraud is frequently charged irresponsibly by people who have suffered a loss and want to find someone to blame for it . . . ; and because charges of fraud (and also mistake, the other charge that Rule 9(b) requires be pleaded with particularity) frequently ask courts in effect to rewrite the parties' contract or otherwise disrupt established relationships. By requiring the plaintiff to allege the who, what, where, and when of the alleged fraud, the rule requires the plaintiff to conduct a precomplaint investigation in sufficient depth to assure that the

13

>   charge of fraud is responsible and supported, rather than defamatory and extortionate.

*Id.* (citations omitted). The rule is particularly appropriate in civil RICO cases where the fraud is alleged as part of a pattern of racketeering activity that can subject the defendant to treble damages and attorneys fees. *See Jepson v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994) ("These details are mandated not only by Rule 9(b), but by the very nature of a RICO claim. For without an adequately detailed description of the predicate acts of mail and wire fraud, a complaint does not provide either the defendant or the court with sufficient information to determine whether or not a pattern of racketeering activity has been established.") (internal quotation omitted).

Dandy Veal notes that Rule 9(b)'s particularity requirement is relaxed where the plaintiff lacks access to all facts necessary to detail his claim. Br. in Opp. (ECF No. 32) at 10 (citing *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998)). In its view, this is such a case. But in *Corley*, the facts to which the plaintiff lacked access were to the circumstances of the fraudulent statements allegedly made to unidentified third parties. *Id.* at 1051. The plaintiff's allegations of the fraudulent representations made to him were sufficiently pled. It was only as to certain unidentified third parties that the court held the requirement needed to be relaxed. *Id.* ("We have noted on a number of occasions that the particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim, and that is most likely to be the case where, as here, the plaintiff alleges a fraud against one or more third parties."). Here, Dandy Veal alleges that it was a victim of Lehman's racketeering activity. Yet, Dandy Veal has failed to allege any of the particulars of the fraudulent representations it seeks to attribute to Lehman. Indeed, it alleges no facts that would give rise to even an inference that Lehman, a

principal in an investment firm that purchased Packerland, was personally involved in the management or control of the company, let alone that he intentionally directed those involved in running the company to misrepresent the protein content of its product. To justify relaxation of the heightened pleading standard for fraud, there must at least be some reason provided to believe that the defendant actually engaged in fraud. Otherwise, the central purpose for the rule is undermined. A plaintiff cannot simply throw out allegations of fraud and then hope discovery will uncover the facts to support them. This is precisely what Rule 9(b) is intended to prevent. *Ackerman*, 172 F.3d at 469. Relaxation of those standards under the circumstances of this case is not warranted.

**E. Remaining State Law Claims**

Dandy Veal also asserts a WOCCA claim under Wis. Stat. § 946.80, *et seq.*, which both parties acknowledge is modeled on RICO and is controlled by federal precedent interpreting RICO. Thus, Dandy Veal's WOCCA claim will also be dismissed for the same reasons its RICO claim fails.

Dandy Veal's remaining claims arise under other Wisconsin statutes and common law. As previously noted, federal jurisdiction in this matter is predicated on 28 U.S.C. §§ 1331 and 1367. Dandy Veal and Packerland are both Wisconsin citizens and thus complete diversity is not present. With Dandy Veal's RICO claim dismissed, this court lacks jurisdiction over Dandy Veal's remaining claims and the proper practice is to dismiss the remaining state claims without prejudice. *See* 28 U.S.C. § 1367(c)(3); *see also Payne for Hicks v. Churchich*, 161 F.3d 1030, 1043 (7th Cir. 1998) ("Indeed, when the district court dismisses all federal claims before trial, the usual and preferred course is to remand the state claims to the state court unless there are countervailing considerations.").

Accordingly, Dandy Veal's false advertising claim under Wis. Stat. § 100.18, intentional fraud, strict responsibility misrepresentation, and breach of contract claims shall be dismissed without prejudice. Maxum and Farmland's motions to intervene, bifurcate, and stay will be denied as moot.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' motion to dismiss (ECF No. 16) is **GRANTED** as to Counts One (RICO) and Two (WOCCA) and those claims shall be dismissed with prejudice. Plaintiff's remaining claims shall be dismissed without prejudice. Maxum and Farmland's motions to intervene, bifurcate, and stay (ECF Nos. 10, 24, and 26) are **DENIED** as moot. The Clerk is directed to enter judgment forthwith.

Dated this   23rd   day of May, 2017.

                                              s/ William C. Griesbach
                                              William C. Griesbach, Chief Judge
                                              United States District Court